**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHN OSHOP, GLENDA OSHOP, and** | ) | |
| **C.O., by and** | ) | |
| **through her natural guardians** | ) | |
| **and next friends,** | ) | |
| **JOHN OSHOP,** | ) | |
| **and GLENDA OSHOP,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.: 3:09-cv-0063** |
| **v.** | ) | **Judge Trauger** |
| | ) | |
| **RUTHERFORD COUNTY BOARD** | ) | |
| **OF EDUCATION,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Pending before the court is a Motion for Attorney's Fees By Rutherford Board of

Education Defendants (Docket No. 76). For the reasons discussed herein, this motion will be

denied.

**FACTUAL AND PROCEDURAL BACKGROUND**

The court provided a comprehensive overview of the facts of this case in the April 15,

2010 Memorandum accompanying the Order that granted the Motion for Summary Judgment

filed by the Rutherford County Board of Education and the Board's legal counsel, Angel

McCloud (collectively, the "Rutherford County" defendants). (Docket Nos. 72 and 73.) As

discussed in the Memorandum, this case was sparked by a November 2007 incident in which the

1

plaintiffs' (John and Glenda Oshop) daughter, C.O., was touched inappropriately, with her consent, by a boy in her kindergarten class at the Homer Pittard Campus School (HPCS) in Rutherford County. (Docket No. 72 at 2.) After C.O. informed her parents of the incident, they quickly met with C.O's principal (Stan Baskin) and her teacher, and all parties concluded that the unfortunate incident was normal exploratory behavior that could be best addressed discreetly by school officials. (*Id.*)

About two months later, in early January 2008, Mr. Oshop was contacted by the Tennessee Department of Children's Services (DCS) to discuss the "touching" incident and DCS requested an opportunity to conduct an interview of C.O. (*Id.*) Mr. Oshop firmly declined the request and subsequently informed Baskin that he did not want his daughter interviewed because of her "emotional sensitivity." (*Id.*; Docket No. 86 at 2.) Shortly thereafter, on January 22, 2008, a DCS representative, assisted by a Murfreesboro Police Department sex crimes investigator, went to HPCS to conduct the interview anyway, and the DCS representative explicitly told Baskin that he was not allowed to contact the Oshops to advise them that the interview was taking place. (Docket No. 72 at 3.) At this point, Baskin called the Board's legal department for advice on whether he was required to permit DCS to interview a student over the parents' objection. (*Id.*)

Board employee James Evans took the phone call from Baskin and pulled McCloud from a meeting so that she could address Baskin's question; Evans only conveyed to McCloud that DCS was at HPCS and that DCS wanted to interview a child there. (Docket No. 67 Ex. 1 at 27-28.) Based upon this understanding, McCloud advised Evans that Baskin had to allow DCS to conduct the interview at the school. (*Id.*) Indeed, at this time, the Board's policy, which was

2

based upon a 1987 (and since re-affirmed) Tennessee Attorney General opinion, required school administrators and employees to cooperate in DCS investigations, including permitting child abuse review teams to conduct interviews while the child was at school. (Docket No. 64 Exs. 1-2.) Evans relayed McCloud's advice to Baskin who indicated that he would not prevent the interview from taking place. (Docket No. 72 at 3.)

Thereafter, DCS conducted the interview of C.O at HPCS. (Docket No. 86 at 2-3.) According to Mr. Oshop's affidavit filed in conjunction with this motion, that evening, the DCS case worker contacted Mr. Oshop and informed him that the unauthorized interview has been conducted. (Docket No. 87 at 3.) Upset, Mr. Oshop immediately contacted Baskin and demanded to know why his daughter had been interviewed. (*Id.*) Mr. Oshop contends that, at that point, Baskin claimed that he would have been cited with "obstruction of justice" if he had refused to cooperate with DCS. (*Id.*) During the same call, Baskin also told Mr. Oshop that he had only allowed the interview to proceed after being directed to do so by the Board's legal counsel. (*Id.*) Mr. Oshop claims that he had no further contact with school board officials regarding the interview and obtained legal counsel within days. (*Id.*)

In the pending motion, the parties focus on the period between the interview and when the plaintiffs filed this lawsuit on January 20, 2009. For instance, on March 21, 2008, plaintiffs' counsel, Brad Hornsby, wrote a letter to the Board demanding the legal authority that the Board relied upon in permitting the DCS interview. (Docket No. 76 Ex. 1.) On April 1, 2008, McCloud responded by enclosing a copy of the 1987 Attorney General opinion, which, she claimed, "clearly indicates the DCS may interview a child at school without parental permission." (*Id.*) On August 12, 2008, Hornsby sent a letter to the Board's Director of

3

Schools, Harry Gill, offering to settle the matter for $75,000 and alleging that, among other things, during their January 22 conversation, McCloud informed Baskin that "failure to allow DCS to interview [C.O.] would be obstruction of justice." (Docket No. 76 Ex. 2.)

In the same letter, Hornsby also stated that he did not view the 1987 Attorney General opinion as controlling as that opinion focused upon situations in which "the parents are suspected of child sexual abuse," which was obviously not the case here. (*Id.*) In sum, in the August 12, 2008 letter, Hornsby suggested that the Board (through McCloud's pressure) and DCS had operated in tandem to deprive the Oshops of their constitutional right to raise their daughter as the Oshops saw fit. (*Id.*) On August 18, 2008, in a brief response, Gill again cited the 1987 Attorney General opinion as justifying the Board's conduct and expressed disappointment that a lawsuit appeared inevitable. (Docket No. 76 Ex. 3.) This letter does not refute the "obstruction of justice" allegation. (*Id.*)

On January 20, 2009, the plaintiffs filed their Complaint under Section 1983 and for negligent infliction of emotional distress (NIED) naming DCS, two "John Doe" defendants at DCS (in their individual and official capacities), McCloud (in her individual and official capacity), the Board, and individual members of the Board (in their official capacities) as defendants. (Docket No. 1.) The Complaint contains the allegation that "McCloud . . . threatened to bring charges of obstruction of justice against [Baskin] if [Baskin] did not consent to the interview." (*Id.* at 4.)

Ultimately, the plaintiffs did not find success in pursuing this litigation. For a variety of reasons that need not be repeated here, the claims against the DCS defendants were dismissed largely without reaching the underlying merits of those claims. (*See* Docket Nos. 32, 74, 85.)

4

Additionally, on April 15, 2010, after previously dismissing the official capacity claims against

the individual members of the Board as redundant of the claims against the Board itself (Docket

Nos. 48-49), the court granted summary judgment to McCloud and the Board, dismissed them

from the case and entered a Rule 54(b) Judgment in their favor.  (Docket No. 73.)

On May 17, 2010, the Board and McCloud moved for their attorneys' fees, under 42

U.S.C. § 1988.[1]  (Docket No. 76.)  Supported by affidavits and billing invoices describing the

work performed and the billing rates, the Rutherford County defendants assert that the

$33,195.00 in attorney and paralegal fees to defend this litigation were reasonably incurred and

that they are entitled to recovery of this amount from the plaintiffs.  (Docket No. 76 at 1; Docket

Nos. 79-81.)

## ANALYSIS

**I      Attorneys' Fees Under 42 U.S.C. § 1988**

**A.      Standard of Review**

As noted above, McCloud and the Board move for attorneys' fees under 42 U.S.C. §

1988(b).  That provision permits the court, in its discretion, to award a "reasonable attorney's

fee" to the prevailing party in "any action . . . to enforce a provision of" Section 1983.  42 U.S.C.

§ 1988(b).  While the provision itself does not distinguish between a prevailing plaintiff and a

prevailing defendant, the Sixth Circuit has construed this language to primarily support

---

[1] The motion for attorneys' fees is explicitly brought on behalf of McCloud, the Board, and the individual members of the Board, who, again were only sued in their official capacities. (Docket No. 76; Docket No. 88 at 2.)  As it makes no difference to the resolution of this motion, it is not necessary to consider whether, because, in an official-capacity suit, the government entity is "the only true defendant[]," it is appropriate for the defendants to bring this motion on behalf of individuals who were never "true defendants." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003).

5

attorneys' fees for prevailing plaintiffs in civil rights cases. That is, "an award of attorney fees against a losing plaintiff in a civil rights action," while not unheard of, "is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Riddle v. Egensperger*, 266 F.3d 542, 547 (6th Cir. 2001) (internal quotation omitted).

While bad faith on the plaintiff's part is not required in order to award attorneys' fees in favor of the prevailing defendant, a court should generally only award such fees if the plaintiff's claim was "frivolous, unreasonable, or without foundation," viewed primarily from the plaintiff's perspective at the time that he filed the litigation. *Id*. at 547-48. That is, without allowing the intrusion of hindsight, the court must consider, among other things, "the plaintiff's [factual] basis for bringing suit" and should consider awarding attorneys' fees to the prevailing defendant where "no evidence supports the plaintiff's position or [where] the defects in the suit are of such magnitude that the plaintiff's ultimate failure is clearly apparent from the beginning or at some significant point in the proceedings after which the plaintiff continues to litigate." *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 183 (6th Cir. 1985).

### B.    The Defendants' Position

The Rutherford County defendants argue that, as to them, the plaintiffs' suit was "frivolous, unreasonable, and without foundation" when it was initiated and, therefore, attorneys' fees are appropriate. (Docket No. 77 at 8.) In support of their assertion that the "plaintiffs never had any evidence of any unconstitutional acts performed by any [Rutherford County] defendants," the Rutherford County defendants largely rely upon Mr. Oshop's deposition and the affidavit that he filed in conjunction with responding to this motion. (*Id*. at 9.)

6

For instance, in his deposition, Mr. Oshop did not display a clear understanding of the distinction between the DCS and Rutherford County Board of Education but indicated that he had no well-developed objections to anything that the Board or school officials had done in this case. (Docket No. 77 at 5; *see also* Docket No. 78 Ex. 1 at 95-96.) Mr. Oshop also testified that, despite the allegations in the Complaint, he had "no idea" where Baskin had obtained the understanding that he would be cited with obstruction of justice. (Docket No. 78 Ex. 1 at 116.)

In his affidavit, Mr. Oshop contends that he "approved the complaint filed by my attorney, including the allegation that Angel McCloud told Principal Baskin that he would be cited with obstruction of justice, because when the complaint was filed I naturally made the connection, however incorrect, that Principal Baskin was told he would be cited with obstruction of justice by the School Board's attorney," that is, Mr. Oshop assumed that Baskin had acquired the "obstruction of justice" notion from Baskin's recent conversation with McCloud about permitting the interview. (Docket No. 87 at 3.) As discussed in the summary judgment Memorandum, all sides now agree that McCloud did not threaten Baskin with obstruction of justice if Baskin refused to permit the interview. (Docket No. 72 at 4.)

Therefore, the Rutherford County defendants argue that, all along, the plaintiffs have not had any evidence to back up their Complaint allegations against the Rutherford County defendants (including the "most salacious" "obstruction of justice" allegation) or any evidence that these defendants violated the plaintiffs' constitutional rights. (Docket No. 77 at 10.) Instead, this litigation against these defendants was premised on Mr. Oshop's "emotional reaction" that resulted in "unfounded assumption[s]" and a "failure to investigate" the basic relationships and responsibilities of the relevant parties. (Docket No. 88 at 2-5.)

7

The Rutherford County defendants also stress that, several months prior to filing suit, the plaintiffs and their counsel were well aware of the "specific legal authority demonstrating that employees of [Rutherford County] had no choice but to allow DCS to conduct the interview of C.O." (Docket No. 77 at 9.)  That is, as discussed above, in at least two letters after the interview but before the lawsuit was filed, representatives of Rutherford County provided plaintiffs' counsel with citation to the 1987 Attorney General opinion, which, in the view of Rutherford County, mandated that school officials permit the interview to take place.  (*Id.* at 9-10.)

The Rutherford County defendants also claim that the plaintiffs allowed this litigation to proceed against them for an unreasonable period of time.  That is, in addition to the other non-meritorious claims that the plaintiffs at least briefed, the plaintiffs forced the Rutherford County defendants to defend the NIED claim and the individual capacity claims against McCloud at the summary judgment stage even though, as the court noted in the Memorandum, there was no evidence to support those claims and the plaintiffs had essentially abandoned those claims in the course of responding to the defendants' summary judgment motion.  (*Id.* at 10-12.)

Finally, in the affidavit of D. Russell Mantooth, counsel for the defendants, Mantooth asserts that, shortly before the summary judgment motion was filed, the Rutherford County defendants offered to settle this matter with the plaintiffs.  (Docket No. 79 at 3.)  Under this proposed settlement, the plaintiffs would concede that there was no wrongdoing by the Rutherford County defendants and would release them in exchange for each party bearing its own costs.  (*Id.*)  This offer was rejected, and, therefore, these defendants incurred the significant expense of preparing and filing the summary judgment motion.  (*Id.*)

## C.    The Plaintiffs' Position

In response, the plaintiffs reiterate the significant showing that the defendants must make in this context and argue that, contrary to the defendants' argument, they had a reasonable basis for filing suit against the Rutherford County defendants at the outset, and, therefore, the defendants' motion should be denied.  (Docket No. 86 at 5.)  The starting point for this position is that, "while C.O. was in the care of Rutherford County Schools, the Oshops' right to direct and control the upbringing of C.O. was egregiously violated."  (*Id.*)

This violation, the plaintiffs maintain, was only accomplished because Rutherford County representatives (including Baskin and McCloud) essentially "green-lighted" the interview.  (*Id.*)  Moreover, given that the plaintiffs knew that Baskin had gotten authorization for the interview from the school board attorney, to the plaintiffs, Baskin's reference to "obstruction of justice" created the reasonable inference that the school board attorney (later determined to be McCloud) had imposed undue pressure on Baskin to make sure that the interview took place.  (*Id.*)  Therefore, the plaintiffs maintain that it was entirely reasonable to file a complaint that alleged that the Board was largely "responsible for the interview which violated their rights."  (*Id.* at 5-6.)

While the plaintiffs concede that the discovery process showed that McCloud had not made the "obstruction of justice" statement, they argue that it was still reasonable to maintain a challenge to the Rutherford County policy of permitting the interview in this instance through the summary judgment process.  (*Id.* at 6.)  That is, in light of the fact that the 1987 Tennessee Attorney General opinion is largely directed toward situations in which the presumed abuse of the child is occurring outside of the school (and therefore the school operates as a refuge or

9

"neutral setting" for the DCS interview) it was not unreasonable for the plaintiffs to challenge Rutherford County's reflexive reliance on this opinion to justify its allowance of the interview in this factually distinct circumstance. (*Id.* at 6-7; Docket No. 64 Ex. 1 at 3.)

### D.    Analysis

The Rutherford County defendants have failed to meet their considerable burden of showing that this is a truly "extreme" or "egregious" civil rights case in which, in additional to bearing Rule 54(d) costs, the plaintiffs should bear the defendants considerable attorneys' fees as well. From the time of the interview through the commencement of this litigation, the plaintiffs knew that there was a connection between the Board and permitting the interview and, the plaintiffs, based upon Baskin's comments, had some reason to believe that Rutherford County officials had pressured Baskin to allow the interview.

While the defendants here argue that the Oshops should not have filed this case without more clearly identifying the relationships between the relevant parties and their exact roles in permitting the interview, the record (built by the defendants here) hardly indicates that the Rutherford County defendants were particularly helpful in this regard. For instance, as noted above, on August 12, 2008, plaintiffs' counsel sent Mr. Gill (Director of Schools) a settlement offer. (Docket No. 76 Ex. 2.) In this offer, plaintiffs' counsel recited the relevant facts of this case and included the "obstruction of justice" allegation. (*Id.*) In the August 18, 2008 response, Gill exclusively (and curtly) relied upon the 1987 Attorney General opinion to justify Rutherford County's actions and made no effort to correct any misapprehension as to the "obstruction of justice" allegation. (Docket No. 76 Ex. 3.) Determining the precise conduct of each relevant party is generally the purpose of the discovery process, particularly, where, as here, pre-litigation

10

negotiations do not appear to have been particularly open or fruitful.

While the plaintiffs certainly could have simplified the summary judgment process by voluntarily dismissing their more unsupportable claims, the court does not view the plaintiffs' failure to dismiss some of this action at an earlier stage as "egregious" or as an example of "extreme" misconduct. The discovery process was clearly necessary in this case to establish what precisely the role of Rutherford County had been in allowing the interview to take place. The defendants are not entitled to attorneys' fees simply because, as is often the case, discovery and related summary judgment briefing reveals that the defendants had no liability. Additionally, the fact that the plaintiffs declined a settlement offer that would have required the plaintiffs to concede that the County had done nothing wrong (a position with which the plaintiffs still disagree) is hardly "egregious" conduct.

This was a case in which the plaintiffs were rightly troubled about the level of respect given by DCS and the County to their expressed wishes as parents as to how their daughter should be treated while at the school. Whatever the motivations of DCS in conducting this interview or the County representatives in permitting it, it is hard to conceive of a situation in which a parent in the plaintiffs' circumstance would not be outraged by the events that sparked this case. The right to "establish a home and bring up children" has long been recognized as an "essential" and fundamental right protected by the Due Process Clause of the Fourteenth Amendment. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Consistent with the Sixth Circuit's interpretation of 42 U.S.C. § 1988, conscientious and reasonable challenges to alleged violations of that right should not be discouraged by the courts simply because discovery and summary judgment briefing revealed those challenges to be ultimately without merit. Awarding these

11

defendants the substantial attorneys' fees requested here would certainly discourage future

reasonable civil rights litigation and, therefore, the court will not award the defendants attorneys'

fees in this case.[2]

## CONCLUSION

For the reasons discussed herein, the Motion for Attorney's Fees By Rutherford Board of

Education Defendants will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

.

---

[2] It is, therefore, not necessary to reach the issue of the reasonableness of the requested fees. That said, given that the hourly rates charged by defense counsel did not exceed $150 per hour, the court can detect nothing in the papers that indicates that the rates charged were unreasonable.

12